# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-1547V
UNPUBLISHED

| | |
|---|---|
| CHASSIE CLEMENS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: May 17, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barré Syndrome<br>(GBS) |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Meghan Murphy*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On October 3, 2019, Chassie Clemens filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from Guillain-Barre syndrome ("GBS") as a result of an influenza ("flu") vaccine she received on October 6, 2016. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although Respondent conceded entitlement, the parties were not able to settle damages.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$204,233.89**, **representing $180,000.00 for actual pain and**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**suffering and $24,233.89 as reimbursement of a lien for services render to Petitioner by South Country Health Alliance.**

## I.     Relevant Procedural History

This case was initiated on October 3, 2019. On December 28, 2020 (approximately 14 months after initiation), Respondent filed a Rule 4(c) Report conceding entitlement. ECF No. 30. A Ruling on Entitlement was issued on December 29, 2020. ECF No. 31. After attempting to resolve the issue of compensation for several months, the parties informed me in July 2021 that they were unable to reach an agreement. ECF No. 39. Petitioner filed a Motion for Ruling on the Record Regarding Damages ("Mot.") on September 9, 2021. ECF No. 41. Respondent filed a Brief on Damages ("Br.") on September 10, 2021. ECF No. 43. Petitioner filed a Reply to Response to Motion for Ruling on the Record ("Repl.") on October 12, 2021. ECF No. 44. Respondent filed a Response to Motion for Ruling on the Record ("Op.") on October 13, 2021. ECF No. 45. Petitioner's Motion is now ripe for resolution.

Petitioner argues that an award of $225,000 in past and future pain and suffering is appropriate considering Petitioner's "severe pattern of pain and discomfort" and ongoing significant sequelae, including chronic weakness, loss of facial muscle control, pain and chronic fatigue for more than four years. Mot. at 1. In addition, Petitioner requests $24,489.18, in satisfaction of a Medicaid lien. *Id.* at 27.

Respondent, by contrast, proposes an award of $77,500 in pain and suffering is appropriate due to Petitioner's modest course of treatment for GBS, including a six-day hospitalization, five days of IVIG, and no inpatient rehabilitation. Br. at 8-9. While Petitioner continues to suffer some sequelae of her GBS, the majority of Petitioner's residual symptoms are attributable to distinguishable conditions, including chronic fatigue syndrome, insomnia, restless leg syndrome, and fibromyalgia. *Id.* at 8. Respondent also disputes the amount of Petitioner's Medicaid lien, agreeing only to reimbursement of $24,129.90 ($359.28 less). Op. at 6.

## II.    Relevant Medical History

On October 6, 2016, Petitioner, who was 36 years old at the time, received the flu vaccine. Ex. 1 at 1; Ex. 2 at 7. At the time, Petitioner's medical history included asthma, anxiety and depression, polycystic ovary syndrome, fatigue, and obesity. Ex. 3 Part I at 70.

After her vaccination, Petitioner presented to the emergency room on three occasions – October 28, 2016, October 31, 2016, and November 1, 2016 – with complaints of worsening symptoms, including: back pain, nausea, numbness and tingling

2

in her hands and feet, numbness in her mouth and difficulty swallowing, difficulty walking, and urine incontinence. Ex. 3 Part I at 186-244. She was discharged each time, however. *Id.*

On November 3, 2016, Petitioner presented to the adult ambulatory care clinic at the Mayo Clinic in Cannon Falls, Minnesota complaining that she was unable to smile, talk properly, eat or drink, and that she was dizzy and had blurred vision. Ex. 3 Part I at 254. Dr. Megan Johnson-Flanders ordered Lyme and angiotensin-converting enzyme tests and an MRI, and consulted with neurology. *Id.* at 256. She prescribed Percocet and prednisone. *Id.* at 257.

Petitioner returned to the emergency room on November 6, 2016, now complaining of chest pain. Ex. 3 Part I at 273. She was offered transfer to a different hospital, but opted to be discharged and consult with a neurologist the following day. *Id.* She returned to the emergency room on November 8, 2016, with continuing chest pain, continuing numbness in her hands and feet, a sensation of crawling on her skin, and shaking in her lower extremities. *Id.* at 312. Petitioner was discharged with a diagnosis of suspected panic attack. *Id.*

On November 10, 2016, Petitioner presented to neurologist Dr. Karen Truitt. Ex. 3 Part I at 344. On exam, Dr. Truitt found that Petitioner was unable to close her eyes, had bilateral facial paralysis, hypoactive deep tendon reflexes, and absent ankle jerks. *Id.* at 346. Dr. Truitt's differential diagnosis included GBS. *Id.* She ordered additional blood work and an EMG. *Id.* The EMG was performed on November 17, 2016, by neurologist Dr. Priya Dhawan, who diagnosed Petitioner with GBS and admitted her to the hospital. *Id.* at 401-407.

Petitioner remained hospitalized from November 17, 2016, to November 23, 2016, where she received a five-day course of IVIG, physical therapy, occupational therapy, and speech therapy. Ex. 3 Part I at 416-515. Petitioner was discharged to her home. *Id.* at 511.

Petitioner followed up with Dr. Truitt on December 1, 2016, after her discharge. Ex. 3 Part I at 521. Dr. Truitt's noted that although Petitioner's symptoms had improved, she continued to have a significant amount of facial weakness and difficulty closing her eyes tightly. *Id.* She assessed "stable, slowly improving GBS" and expected Petitioner to make a full recovery. *Id.*

On March 27, 2017 (now approximately five months after onset of her symptoms), Petitioner reported continuing facial weakness and persistent fatigue to her primary care physician. Ex. 3 Part I at 575. Petitioner was clear to return to her college classes. *Id.* Ms.

Clemens continued to report right-sided facial weakness, fatigue and impaired balance on May 9, 2017 at her annual exam. *Id.* at 604-05.

On May 17, 2017, Petitioner began physical therapy in order to improve her balance.³ *Id*. at 619. Petitioner was also treated for fatigue management. *Id.* at 697. After six treatments, she was discharged on July 7, 2017. *Id.* On May 26, 2017, Petitioner had a speech therapy evaluation for complaints of facial weakness and dysarthria. *Id.* at 629. She was discharged from speech therapy on July 6, 2017, having met all of her goals and with "improved oral control with eating and drinking a well as control for speech." *Id.* at 696.

On July 20, 2017, nine months after the onset of symptoms, Petitioner retuned to Dr. Truitt with complaints of worsening facial weakness, heaviness in her arms, numbness in her lips, and increasing fatigue. Ex. 3 Part II at 1. Dr. Truitt ordered a repeat EMG, which revealed "marked improvement" from her previous EMG and "no evidence of denervation or findings to suggest" a recurrence of GBS. *Id.* at 5-6.

Petitioner continued to seek treatment for persistent weakness, fatigue and pain in the following months and years. On September 19, 2017, Dr. Truitt attributed Petitioner's symptoms not to GBS, but to deconditioning, and referred her to physical rehabilitation. Ex. 3 Part II at 44. Petitioner was diagnosed with chronic fatigue syndrome on September 29, 2017, and with restless leg syndrome and multifactorial insomnia on October 3, 2017. *Id.* at 62, 66.

At a regular follow-up on February 1, 2018, Dr. Truitt documented continued right facial weakness from Petitioner's GBS. Ex. 3 Part V at 401. Petitioner's facial weakness continued at least through January 10, 2019, when Dr. Truitt's exam revealed similar findings, with possible mild worsening of Petitioner's difficulty in closing her eyes. Ex. 3 Part IV at 383. Dr. Truitt did not feel there was evidence of recurrent GBS. *Id.*

Petitioner continued to report ongoing symptoms, including continued numbness in her hands and feet and facial weakness and paralysis through early 2021. On March 24, 2021, Dr. Truitt's exam revealed improvement in Petitioner's facial and extremity weakness comparted to two years prior, but did not continuing facial synkinesis on the right side. Ex. 7 at 23. At the same visit, Dr. Truitt diagnosed Petitioner with fibromyalgia. *Id.*

---

³ Petitioner began physical therapy treatment on March 30, 2017, for right shoulder pain after she slipped on ice. Ex. 3 Part I at 585. She was discharged from shoulder PT on May 17, 2017, when she began PT for her balance problems. *Id*. at 618-19.

### III.     Testimony and/or Affidavits

Petitioner submitted two affidavits - the first dated October 3, 2019 (ECF No. 5), and the second dated September 2, 2021 (ECF No. 42). In her first affidavit, Petitioner described the onset and treatment of her acute GBS, as well as her life prior to her diagnosis. Petitioner's symptoms began, approximately 20 days after her influenza vaccination, with tingling in her hands and feet, followed quickly by "extreme pain in her back." Ex. 4 at ¶4. She reported "numbness and tingling . . . so severe that she could not eat or drink, was having trouble holding onto items and walking." *Id*. at ¶5. She also described "weeks in severe pain, unable to eat or drink" and "becoming quite scared, confused and concerned as to what was happening." *Id*. at ¶6. She "saw multiple doctors" and "had various MRI, CAT scans, and other tests." *Id.*  She "rapidly lost weight," her "face went slack . . . and her speech was slurred," and she "was unable to care for her children." *Id.*  She had to take a leave from school. *Id.*

During her hospitalization and IVIG treatment, Petitioner "was in severe pain the whole time." Ex. 4 at ¶7. She described spending "2017 and 2018 recovering and going to therapy." *Id.* at ¶8. Petitioner was "very unsteady on her feet" and "couldn't talk or use her mouth very well." *Id*.

Prior to her GBS, Petitioner was a single parent to two special needs children, was attending school to become a Registered Health Technician, and was building a house with Habitat for Humanity. Ex. 4 at ¶6, 9. She participated in hobbies such as photography, and volunteered at her church and preparing tax returns for low income and elderly taxpayers. *Id*. at ¶9. Petitioner characterized her disease course as "traumatic," particularly her ongoing facial symptoms, which cause her embarrassment. *Id*. at ¶10. She described how she would "cry when she eats or talks to much" and how she has to use special care with dental hygiene. *Id.* Petitioner is unable to "sip through a straw or make a fish face." *Id.* She describes dental work as "very painful because the nerves in her face do not numb very well." *Id.* In addition, Petitioner stated that her face "has not returned to what it was and it is visibly apparent to others." *Id.*

In her Supplemental Affidavit, Petitioner notes that almost two years after her original affidavit, she is "still not fully recovered." ECF No. 42 at ¶3. She states that her "facial muscles still do not work properly." *Id.* at ¶4. She describes continuing "pain, weakness, and numbness" and continuing treatment for her symptoms. *Id*. at ¶5, 7.

### IV.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover

"actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.,* 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl.

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

6

2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### V.    Appropriate Compensation for Petitioner's Pain and Suffering

#### a.  *Pain and Suffering*

In this case, awareness of the injury is not disputed. The record reflects that at all times Ms. Clemens was a competent adult with no impairments that would impact her awareness of her injury. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. Ms. Clemens's medical records, affidavit, and supplemental affidavit provide descriptions of the pain and suffering she experienced during her illness. In her Motion, she cites to a number of damages decisions involving GBS injuries and compares her own experience with GBS to those of the petitioners in those cases.[5] Mot. at 19-22. Petitioner argues that her period of pain and suffering was longer than the petitioners in all four cited cases, and continues to the present. *Id.* at 22.

In contrast, Respondent argues that even if Petitioner continues to experience facial weakness and muscle spasms, her *other* continuing symptoms are not sequelae of her GBS. Br. at 8. And otherwise, Petitioner's course was not unusually protracted. She was discharged home after her hospitalization and cleared to return to her college classes less than six months after her vaccination, a course less severe than petitioners in the cases cited by Petitioner. *Id*. Further, when Petitioner began complaining of worsening symptoms approximately nine months after her vaccination, neurological testing revealed no active GBS. *Id.* at 7-8. Petitioner's neurological exams continued to improve, but she

---

[5] In particular, Petitioner cited to *Johnson v. Sec'y of Health & Human Servs.*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering); *Dillenbeck v. Sec'y of Health & Human Servs.*, 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $180,857.15 for pain and suffering); *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) (awarding $180,000 for pain and suffering); *Presley v. Sec'y of Health & Human Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020) (awarding $180,000 for pain and suffering).

was subsequently diagnosed with chronic fatigue syndrome, insomnia, restless leg syndrome, and fibromyalgia, which explain her continuing complaints of fatigue and chronic pain and weakness. *Id*.

After reviewing the record in this case and considering the parties' written arguments, I find that the record best supports the conclusion that Petitioner suffered a moderate GBS injury - as far as that kind of injury goes (an important qualification). I have noted in prior decisions that GBS constitutes a particularly alarming kind of vaccine injury – and that as a result, the pain and suffering award allowed should be a bit higher than average. *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021). At the same time, however, the considerations that always impact a pain and suffering award – length of hospitalization, degree and number of procedures for treatment, post-treatment recovery, etc. – all impact the final figure to be awarded.

The comparable damages decisions from other GBS cases cited by Petitioner were helpful in determining the amount to be awarded in this case. In all four cases cited, petitioners were awarded $170,000 to $180,000 in past pain and suffering. While this "range" does not explicitly govern the outcome herein (and special masters would always be free, depending on case circumstances, to award more or less), it provides reasoned guidance about what a just and fair award looks like for a person experiencing vaccine-caused GBS.

I find Petitioner's situation to be most similar to the Petitioner in *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020). That petitioner was a full-time dental equipment repairman and father of seven children at the time of his vaccination. *Id*. at *2. Mr. Fedewa presented to the emergency room twice and was discharged, being diagnosed and admitted only after he fell in his yard and returned to the hospital. *Id*. He had two lumbar punctures and two EMGs, and a five-day course of IVIG during his eight-day hospitalization. *Id*. at 2-3. He spent five days in inpatient rehab and then continued with outpatient physical therapy for an additional three months. *Id*. at *3. Mr. Fedewa as unable to work or drive for three months. *Id*. at *6.  Mr. Fedewa continued to take medications for his GBS after his primary treatment and suffered from depression for more than a year. *Id*. at *6. Mr. Fedewa was awarded $180,000 for his actual pain and suffering. *Id.* at *1.

Ms. Clemens was also a parent at the time of her vaccination, and she was enrolled in a college training program. Ex. 4 at ¶9. She similarly endured hardship to obtain her GBS diagnosis, presenting to the emergency room on five separate occasions, presenting to out-patient specialists, including two neurologists, and undergoing numerous tests including xray, CT, EKG, MRI, EMG and lumbar puncture. Ex. 3 Part I at 166-407. Ms.

Clemens then had a similar hospitalization course, with six days inpatient and five days of IVIG treatment, along with inpatient physical, occupational, and speech therapy. *Id.* at 410-515. Petitioner did not receive inpatient rehab or outpatient therapies immediately after her discharge from the hospital.

Ms. Clemens followed up with her neurologist, Dr. Truitt, on December 1, 2016 (8 days after discharge) and with her PCP on March 29, 2017 (approximately 4 months after discharge). Ex. 3 Part I at 521, 594. At Petitioner's March 29, 2017 visit with her PCP, Dr. Johnston-Flanders provided a letter stating that Petitioner was fit to return to school and noted that the right side of Petitioner's face was still a little weak, but improving. *Id.* Ms. Clemens's GBS continued to improve.

On May 9, 2017, physical therapist Anne Johnson, who was treating Petitioner's right shoulder injury, requested that Dr. Johnson Flanders order physical therapy for Petitioner's balance impairments. Ex. 3 Part I at 602. Between May 17, 2017 and July 7, 2017, Petitioner received physical therapy for balance issues and speech therapy for her facial weakness. *Id.* at 619-697. Upon discharge from PT, Petitioner felt "like things were continuing to improve" and complained primarily of fatigue. *Id.* at 697. Upon discharge from speech therapy, Petitioner had accomplished all of her goals and expected outcomes. *Id.* at 696.

Not all of Petitioner's post-injury symptoms can be shown to be related to her GBS, however. Beginning in July 2017 (now approximately nine months after her vaccination), Petitioner began to complain again of worsening weakness, increasing fatigue and heaviness and numbness in her limbs. Ex. 3 Part II at 1. Through the remainder of 2017 and continuing into 2021, Petitioner has continuously complained of pain, numbness/tingling, and fatigue. However, since July 2017, her neurological exams have consistently shown improvement and her GBS has not recurred. *See e.g.* Ex. 3 Part II at 1, 43, 381. Additionally, Petitioner was subsequently diagnosed with the following: chronic fatigue syndrome (September 29, 2017 – Ex. 3 Part II at 62); restless leg syndrome and insomnia (October 3, 2017 – Ex. 3 Part II at 66); and fibromyalgia (March 24, 2021 – Ex. 7 at 22). As Petitioner's neurologist has consistently noted the lack of active GBS, these subsequent diagnoses more likely than not explain Petitioner's worsening, rather than improving, symptoms – and the conditions themselves have *not* been shown to have been caused by GBS. Therefore, I find that Petitioner's complaints of pain, fatigue, and numbness/tingling from July 2017 onward are more likely than not attributable to her *subsequent* diagnoses, rather than sequelae of her GBS.

This is not to say that Petitioner has fully recovered from her GBS and has no ongoing sequelae. The records are clear that Petitioner continued, at least through February 8, 2021, to experience weakness in her facial muscles when Dr. Mansi Kanuga,

9

an allergist, noted that her "residual perioral weakness impacted her ability to effectively use her inhaler therapy" for her asthma. Ex. 7 at 58. The impact of Petitioner's continuous and ongoing facial weakness is well documented throughout the records, including in Petitioner's description in her supplemental affidavit of her smile being "completely different now," which is also revealed by the photographs filed. Supp. Aff. at ¶7; Ex. 8.

For these reasons, I find that Respondent's recommendation of $77,500.00 is far too modest, even though I accept his argument that not all post-vaccination sequelae were related. Respondent's proposed figure fails to properly recognize Ms. Clemens's experience with her initial symptoms, diagnosis, hospitalization and treatment course for her GBS, and the significant impact on her life. Rather, the "best" pain and suffering sum to be awarded is substantially higher – though not as high as Petitioner requests.

Ms. Clemens's residual symptoms that *are* attributable to her GBS appear to be lingering long-term, and she has asked that her future pain and suffering be taken into account in the damages awarded. This, plus the fact that I deem her "actual" pain and suffering to be slightly less significant than in the comparable cases, suggests to me that justice can be served by factoring in her potential for future pain and suffering into the actual pain and suffering award. Accordingly, balancing the severity of a GBS injury and Petitioner's personal loss against the relatively moderate severity of disease course and treatment requirements, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$180,000.00** in total compensation for actual/past pain and suffering is reasonable and appropriate in this case.

### b. *Reimbursement of Medicaid Lien*

The Act does not allow petitioners to recover compensation "for any item of service to the extent that payment has been made . . . under any Federal or state health benefits program . . . ." Section 15(g). This means that where claimants have received prior treatment for their vaccine injury under a Federal program like Medicaid, a lien arises against any Vaccine Program award for the value of that medical service. *See e.g. Simmons v. Sec'y of Health & Human Servs.*, No. 11-216V, 2019 WL 2572256 (Fed. Cl. Spec. Mstr. May 28, 2019).

Here, Petitioner reports that a Medicaid lien exists against her award, calculating it in the sum of $24,489.18.[6] Mot. at 27. In response, Respondent argues that "not all charges included in the lien documentation were related to Petitioner's GBS." Op. at 6.

---

[6] Petitioner attached a detailed listing of her medical claims paid by Medicaid at Exhibit A to her Motion.

Respondent proposes an award of $24,129.90, but has not listed which specific medical claims he found objectionable. *Id.*

Upon review of the records, it appears that some of the treatment appearing on Petitioner's Medicaid documentation was not directed at her GBS, but at other conditions, such as a right shoulder injury, asthma, and anxiety. Where it is clear from the records that treatment was for a condition *other* than GBS, and/or not shown to be a related sequela, I cannot permit the sum's inclusion in the lien.

Here, I find certain specific charges to properly be excluded from the damages award. Their elimination results in a total lien reimbursement that is slightly more than what Respondent proposed. In particular:

- From March 30, 2017, through May 3, 2017, Petitioner received physical therapy treatment for a shoulder injury she sustained from a fall on ice. *See* Ex. 3 Part I at 575, 585-618. While Petitioner may have mentioned ongoing symptoms that may be related to her GBS at these visits, there is no evidence that the treatment she received was related to her GBS, or specifically directed at it. This treatment reduces the award by $194.30.[7] Mot. Ex. A at 32.

- On January 2, 2020, Petitioner presented to physician's assistant, Erin Gardeck, with complaints of hot flashes and other vasomotor symptoms. Ex. 7 at 179. Petitioner was not evaluated for or diagnosed with any GBS sequelae at the visit. *Id.* at 179-180. This visit accounts for a reduction of $56.70. Mot. Ex. A at 36.

- Petitioner was prescribed prednisone by Dr. Mansi Kanuga, her treating physician for her asthma, a condition that predated her GBS diagnosis. On each of three dates, Dr. Kanuga prescribed the medication to treat Petitioner's asthma, not any sequelae of GBS. Ex. 3 Part I at 650, Ex. 3 Part IV at 21, Ex. 7-1 at 58. These three prescriptions total $4.29.[8] Mot. Ex. A at 37.

Based on the above, I award Petitioner **$24,233.89** in compensation for satisfaction of the South Country Health Alliance Medicaid lien for services rendered to Petitioner for medical claims for her vaccine related GBS - $255.29 less than what Petitioner requested.

---

[7] One visit at $53.05, three visits at $20.99, and four visits at $19.57. Mot. Ex. A at 32.
[8] One prescription at $1.24, one at $2.11, and one at $0.94. Mot. Ex. A at 37.

### VI. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $180,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[9] I also find that Petitioner is entitled to $24,233.89 as reimbursement for a lien on services rendered on behalf of Petitioner by South Country Health Alliance.**

In light of all of the above, I award the following compensation:

- **A lump sum payment in the amount of $180,000.00, representing actual pain and suffering, in the form of a check payable to Petitioner.**

- **A lump sum payment in the amount of $24,233.89, representing compensation for satisfaction of the South Country Health Alliance Medicaid lien for services rendered on behalf of Petitioner, Chassie Clemens, in the form of a check payable jointly to Petitioner and South Country Health Alliance, 2300 Park Drive, Suite 100, Owatonna, MN, 55060.**

These amounts represent compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[10]

**IT IS SO ORDERED.**

> **s/Brian H. Corcoran**
> Brian H. Corcoran
> Chief Special Master

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.